**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-60558-CIV-ALTMAN/Reinhart**

**MICHAEL J. LIGOTTI**, *et al.*,

     *Plaintiffs*,

*v.*

**UNITED HEALTHCARE SERVICES,**
**INC.**, *et al.*,

     *Defendants.*

_____/

**<u>OMNIBUS ORDER</u>**

In this ERISA lawsuit, the Plaintiffs—Michael J. Ligotti, D.O., and his private practice, a substance-abuse treatment facility called Whole Health, LLC ("WH")—want recompense for medical services they provided to some of their patients. Those patients, in turn, were members of ERISA plans administered by the Defendants, United Healthcare Services, Inc. ("United") and United Healthcare of Florida, Inc. ("United Florida"). The Defendants denied hundreds of the Plaintiffs' claims for one of three main reasons: (1) because Dr. Ligotti—an out-of-network provider whose patients assigned him their claims—wasn't properly licensed; (2) because Dr. Ligotti's license needed verification; or (3) because Dr. Ligotti had misrepresented the nature of the services he was providing. According to the Plaintiffs, these excuses were pretextual and the denials improper.

After briefing and a hearing, the Court granted the Defendants' motion for summary judgment in part, dismissing two of the Plaintiffs' counts and keeping two others. Even as to the two surviving counts, though, the Court narrowed the claims significantly: *first*, by eliminating patient claims for which the governing ERISA plan had an anti-assignment clause; and, *second*, by excluding patient claims the Defendants had denied for reasons *other* than Dr. Ligotti's licensure or his (alleged) misrepresentations.

The Plaintiffs have since filed two motions for reconsideration. As we'll clarify below, the Court's second holding was *not* a summary judgment ruling *on the merits* but rather a limitation on the kinds of claims that would be admissible at trial. Denials having nothing to do with the Plaintiffs' allegations are, it almost goes without saying, irrelevant to this litigation. And, since those unrelated denials aren't technically before us, we can't (and shouldn't) opine on their propriety. Other than that, though, there's nothing in our prior order that needs clarifying: As we said then and reiterate today, the Plaintiffs cannot circumvent the anti-assignment clauses the Defendants separately negotiated with their patients' employers.

One other preliminary matter. Months after we issued the first summary judgment order, Dr. Ligotti asked to be voluntarily dismissed from the case. The Defendants opposed the request and argued (persuasively) that they'd be prejudiced by his dismissal. For one, the Defendants said, with Dr. Ligotti out of the case, his testimony might be hard to come by—a not-insubstantial fear in light of the criminal charges he's now facing.[1] For another, his absence—and the apparent winding down of WH—would make it difficult for the Defendants, were they to prevail, to collect their attorneys' fees and costs. And, since there doesn't appear to be any countervailing benefit to Dr. Ligotti from being dismissed at this late stage of the case, we deny his request.

Which brings us to the main event. In the first round of summary judgment briefing, the Defendants focused primarily on the Plaintiffs' failure to exhaust their administrative remedies. We didn't resolve that question, though, because the parties hadn't adequately briefed it—principally because, as it turned out, they hadn't conducted the necessary discovery. So, we allowed the parties to engage in some additional discovery—as a result of which the Plaintiffs agreed to limit their case to

---

[1] Even if he did testify, his status as a third party under indictment would raise complicated questions about his rights under the Fifth Amendment and the degree to which the factfinder could lawfully draw certain inferences from his silence.

536 patient claims. The Defendants now move for summary judgment as to 493 of those, arguing (as before) that the Plaintiffs failed to exhaust their administrative appeals.

We agree. The ERISA plans that governed those 493 claims unambiguously required the claimants to appeal adverse benefits determinations before filing their federal lawsuits. But the Plaintiffs (as proxies for their patients) *didn't* appeal those denials—or, at least, they don't submit any evidence that they did. Nor have they shown that the appeals process would have been "futile." Since there isn't any other colorable basis to disregard the exhaustion requirement, we **GRANT** the Defendants' motion for summary judgment.[2]

## BACKGROUND

This case began five years ago, when the Plaintiffs filed suit in Florida state court, alleging that, in early 2014, the Defendants began improperly denying (or withholding payment on) the Plaintiffs' insurance claims. *See generally* State Court Complaint [ECF No. 1-27]. According to the Plaintiffs, United denied the claims for one (or more) of the following three reasons: (1) Dr. Ligotti didn't have an active license; (2) Dr. Ligotti's license couldn't be verified; or (3) Dr. Ligotti had misrepresented the nature of the services he was providing. *See id.* ¶¶ 25, 28. The Plaintiffs alleged that these denials were premised on false assumptions, *id.* ¶ 30, and advanced a long litany of state-law claims, including defamation, tortious interference, breach of contract, and violations of FLA. STAT. § 627.6131, *see generally id.*

The Defendants removed the case,[3] contending that the Plaintiffs' state-law claims were really claims for benefits under ERISA health plans—and, as such, completely preempted by federal law. *See generally* Notice of Removal [ECF No. 1]. The Defendants then moved to dismiss the state-law claims as preempted by ERISA. *See* First Motion to Dismiss [ECF No. 10]. The Plaintiffs moved to

---

[2] Only the remaining 43 patient claims will thus proceed to trial.

[3] At the time, the case was assigned to now-Senior Judge William J. Zloch.

3

remand for lack of subject-matter jurisdiction. In their view, the claims didn't implicate ERISA at all because the Plaintiffs were third-party beneficiaries of the insurance plans—not assignees of plan benefits—and because the claims involved duties outside the scope of ERISA. *See* Motion to Remand [ECF No. 24] at 8–10. The Court refused to remand the case and granted the motion to dismiss without prejudice. *See* First Dismissal Order [ECF No. 64].

The Plaintiffs filed a Second Amended Complaint [ECF No. 70], recasting some of their causes of action as ERISA claims and reasserting their state-law claims. Judge Zloch—recognizing that "current trends in the law favor expanded federal court jurisdiction" and endeavoring to remain "faithful to the intent of the Constitution and to the intent of the founding fathers"—dismissed the ERISA claims *without* prejudice and remanded the state-law counts to state court. *See* Second Dismissal Order [ECF No. 85] at 5.

In the now-operative Third Amended Complaint [ECF No. 88], the Plaintiffs brought four ERISA claims. In Count I (against United) and Count III (against United Florida), they sued as assignees of the insureds' claims for plan benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B). *See* Third Amended Complaint ¶¶ 50–59, 70–79. In Count II (against United) and Count IV (against United Florida), they sued as third-party beneficiaries for benefits under § 1132(a)(1)(B). *See id.* ¶¶ 60–69, 80–89.

The Defendants moved to dismiss again, this time arguing that the Plaintiffs (1) failed to plead exhaustion of administrative remedies, (2) failed to plead a basis for entitlement to relief under the terms of each ERISA plan, and (3) lacked standing to sue as third-party beneficiaries. *See* Third Motion to Dismiss [ECF No. 90]. Judge Zloch, in a one-page order, held that "the legal issues raised by Defendants' instant Motion are more properly addressed in a Motion For Summary Judgment, when discovery may present the Court with a full record upon which it may address and decide said issues."

Third Dismissal Order [ECF No. 105]. He then promptly transferred the case to us. *See* Order of Recusal [ECF No. 114].

*** 

Which brings us to the Defendant's First Motion for Summary Judgment ("First MSJ") [ECF No. 149]. Although we've already ruled on the First MSJ, we address it in detail now, as it bears on the Plaintiffs' two pending motions for reconsideration and, to some extent, on the renewed motion for summary judgment.

In the First MSJ, the Defendants marshaled four arguments (three of which they had raised in the Third Motion to Dismiss). *First*, they said that the Plaintiffs lacked standing to sue as third-party beneficiaries and contended that the Plaintiffs could seek benefits under § 1132(a)(1)(B) *only* via a kind of derivative standing obtained by written (and valid) assignments from the patients. *See id.* at 6–7. *Second*, they argued that the Plaintiffs had failed to exhaust their administrative remedies. *See id.* at 7–10. *Third*, they submitted that the Plaintiffs had failed to state a claim under ERISA—principally because the Third Amended Complaint didn't identify the specific plan provisions that purported to confer the sought-after benefits. *See id.* at 11–15. *Fourth*, they claimed that several of the ERISA plans included provisions that prohibited the patients from assigning their benefits to third parties (like the Plaintiffs). *See id.* at 15–18.

At a hearing on the First MSJ, we explained that there were several reasons to dismiss the case on the pleadings. *See* Feb. 14, 2020 Hearing [ECF No. 193]; First MSJ Hr'g Tr. [ECF No. 205]. For one thing, the Third Amended Complaint was a shotgun pleading: it, after all, housed hundreds of unique patient claims (each with its own governing plan, reason for denial, type of service rendered, cost of services, etc.) within just four umbrella causes of action. It was thus "unfair," we thought, for the Defendants to have to "parse through thousands of patients' files, with their plans, and connect the dots" on their own; instead, we said, the Plaintiffs should have filed "a 200-page complaint or 100-

page complaint that laid out patient by patient: This patient was denied on this day for this reason, and we appealed in this way on this date and were told X. And then go to the next patient. And each one should be a different count." *Id.* at 39:18–40:5. Had the Plaintiffs done this, we could have more easily addressed those individual claims. But recall the odd procedural posture. Judge Zloch had denied the Third Motion to Dismiss because, in his view, the questions that motion raised were better suited for summary judgment. And, since the parties had already engaged in substantial discovery, an order dismissing the Third Amended Complaint *without prejudice* would have been "a tremendous waste of everyone's time." *Id.* at 8:11–15.

We also found the Defendants' exhaustion arguments persuasive. The Plaintiffs hadn't pled exhaustion in the Third Amended Complaint. Specifically, they hadn't pled that they'd properly appealed the initial denial of their claims to United's appellate review board. *See id.* at 8:4–5 (noting, with respect to the Plaintiffs' exhaustion arguments, that the Court "unquestionably would have dismissed the complaint for a third time based on the arguments [the Defendants] raised"). And, despite *more than three years* of discovery, there were still substantial *evidentiary* gaps on that issue. So, for example, while the Plaintiffs submitted *some* documents—and while *some* of those documents may have qualified as "appeals" of adverse benefits determinations—those documents had nothing to do with the denials at issue in *this case. See id.* at 86:3–4 (explaining that the Plaintiffs "submitted appeals that have nothing to do with [this] case"). Recognizing that the hearing was going badly, counsel for the Plaintiffs started tossing ideas against the wall: some of the governing plans, they now suggested, allowed *oral* appeals. *See id.* at 52:18–20 (counsel for plaintiffs positing that *one* of the plans "allows for oral appeals" and insisting that "there's other plans that I've seen that it had said that we suggest that you make an appeal in writing, but you may make it orally"). But they couldn't say how many—or even which ones—permitted oral appeals. *See id.* at 53:4–12 ("The COURT: . . . But we don't have any sense of the number of people out of the total number that are going to be allowed to go forward

for whom that's true [*i.e.*, for whom oral appeals were permitted]. MR. BALDWIN: We would have to do that analysis, your Honor. THE COURT: But here we are. It's the summary judgment hearing. This is the day. This is the game. It's like saying, I showed up but the football was left in the locker room.").

Ultimately, although the Plaintiffs had failed to carry their burden, the Court felt it appropriate to give them *one* more chance. And so, we came to a compromise that streamlined the case while deferring the exhaustion issue until the parties had a final opportunity to develop the record. As a threshold matter, then, we granted summary judgment on Counts II and IV (the third-party beneficiary claims) because the Plaintiffs effectively conceded that they couldn't proceed as third-party beneficiaries under ERISA. *See* First MSJ Order [ECF No. 196] ¶ 1(a).

Then we whittled down Counts I and III by dismissing two subcategories of claims. *First*, we granted summary judgement as to those claims that were governed by plans with anti-assignment clauses, because those clauses explicitly precluded the Plaintiffs from standing in the shoes of the insureds. *Id.* ¶ 1(b). And we rejected—as completely unsupported by the record—the Plaintiffs' contention that the Defendants had either waived those provisions or else consented to some of the assignments. *Id.* We also rejected the argument that, through some ineffectual power of attorney, the patients had somehow "assigned" their benefits to the Plaintiffs—notwithstanding the anti-assignment clauses. *Id. Second*, we granted summary judgment as to the subset of claims the Defendants had denied for reasons having nothing to do with Dr. Ligotti's licensure, the need to verify his license, or the possibility that his services "had been misrepresented." *Id.* ¶ 1(c).

Finally, we denied *without* prejudice the Defendants' contention that the Plaintiffs had failed to exhaust their administrative remedies. *Id.* ¶ 1(e). We did, however, allow the Defendants to renew that argument later—*i.e.*, after the parties had time to engage in further discovery "limited *only* to those patient claims that survive[d] the Court's ruling." *Id.*

Having thus narrowed the claims, and in preparation for another round of briefing on exhaustion, we ordered the parties to submit "a spreadsheet in which they shall set out each side's view, given the parameters of this Order, of how many patient claims will survive summary judgment and proceed to trial." *Id.* at 4. We required the parties to include "the precise dollar amount of each such patient's claim—along with each side's take on the total dollar value of all the outstanding patient claims." *Id.* And we instructed the parties to produce to one another the documents *they believed* were material to the Court's resolution of the exhaustion issue. *Id.* ¶¶ 2(a), (c) (requiring the parties to exchange "all evidence in their possession concerning any appeals of claims denials"). After months of additional discovery, the parties submitted a spreadsheet that outlined the 536 claims that have survived the Court's prior rulings. *See* Claims Spreadsheet [ECF No. 216-1].

**MOTIONS FOR CLARIFICATION**

Soon after the Court's First MSJ Order, the Plaintiffs filed two motions for clarification: (1) a Corrected Motion Pursuant to Rules 59(e) and/or Rule 60(b) To Clarify, Alter, and/or Amend Order ("First Clarification Motion") [ECF No. 202];[4] and (2) a Limited Motion for Clarification Pursuant to Rule 60 ("Second Clarification Motion") [ECF No. 204].[5]

## I.    The Law

"The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (cleaned up); *see also Eveillard v. Nationstar Mortg. LLC*, 2015 WL 1191170, at *5 (S.D. Fla. Mar. 16, 2015) (noting that "an intervening

---

[4] The First Clarification Motion is ripe for resolution. *See* Defendant's Response to Plaintiffs' Rule 59(e)/60(b) Motion ("Response to First Clarification Motion") [ECF No. 207]; Plaintiffs' Reply to Defendant's Response to Motion Pursuant to Rules 59(e) and/or 60(b) to Clarify, Alter and/or Amend Order ("Reply to First Clarification Motion") [ECF No. 209].

[5] The Second Clarification Motion is likewise ripe for adjudication. *See* Defendant's Response to Plaintiffs' "Limited Motion for Clarification Pursuant to Rule 60" ("Response to Second Clarification Motion") [ECF No. 208]; Plaintiffs' Reply to United's Response to Plaintiffs' Limited Motion To For [sic] Clarification Pursuant to Rule 60 ("Reply to Second Clarification Motion") [ECF No. 210].

change in controlling law" may serve as a basis for Rule 59 relief). Thus, parties "cannot use a Rule 59(e) motion to relitigate old matters, raise argument[s] or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005); *see also Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) ("The purpose of a Rule 59(e) motion is not to raise an argument that was previously available, but not pressed.").

Under Rule 60(a), a court may correct a judgment "for the purpose of reflecting accurately a decision that the court actually made." *Fed. Home Loan Mortg. Corp. v. Matassino*, 517 F. App'x 687, 688 (11th Cir. 2013) (quoting *Weeks v. Jones*, 100 F.3d 124, 129 (11th Cir. 1996)). Thus, a district court may not amend a judgment "to reflect a new and subsequent intent" but only to "correct clerical errors to reflect what was intended at the time of ruling." *Id.* (quoting *Weeks*, 100 F.3d at 128). Rule 60(b) offers an avenue to seek relief from a final judgment or order, for reasons such as mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, or "any other reason that justifies relief." But it is an extraordinary remedy, and "disagreement with the Court's ruling is an insufficient basis for reconsideration of a prior order." *Martes v. Sacco*, 2011 WL 13272347, at *1 (S.D. Fla. Apr. 7, 2011). Like Rule 59, Rule 60 is "not a vehicle for rehashing arguments the Court has already rejected or for attempting to refute the basis of the Court's earlier decision." *Id.* (quoting *Lamar Advertising of Mobile, Inc. v. City of Lakeland*, 189 F.R.D. 480, 490 (M.D. Fla. 1999)). The rule requires that the moving party "demonstrate a justification for relief so compelling that the district court [is] required to grant [the] motion." *Maradiaga v. United States*, 679 F.3d 1286, 1291 (11th Cir. 2012) (citations omitted); *see also Enax v. Goldsmith*, 322 F. App'x 833, 835 (11th Cir. 2009) ("Relief under Rule 60(b) is an 'extraordinary remedy which may be invoked only upon a showing of exceptional circumstances.'" (quoting *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001))).

Although at least one district court has vacated a partial summary judgment order under Rule 60, *see Zapata Carrero v. Sanabi Invs., LLC*, 2019 WL 3024462, at *3 (S.D. Fla. Mar. 12, 2019), we're not

sure the Rule actually allows that, *see Firestone Bldg. Prod. Co., LLC, v. Ramos*, 750 F. App'x 777, 783 n.4 (11th Cir. 2018) ("[I]t is not clear that a party can obtain relief from an interlocutory summary judgment order under Rule 60(b), because Rule 60(b) authorizes a district court to grant relief from 'a final judgment, order, or proceeding.'"); *see also Mullins v. Nickel Plate Mining Co., Inc.*, 691 F.2d 971, 974 (11th Cir. 1982) ("Rule 60(b) applies only to final judgments."); *Ermini v. Scott*, 937 F.3d 1329, 1339 (11th Cir. 2019) ("Unlike a jury verdict, a partial summary judgment is not a 'final decision' under 28 U.S.C. § 1291."). No matter: We could always reconsider the summary judgment order under our inherent authority because "a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court." *Oliver v. Orange Cty.*, 456 F. App'x 815, 818 (11th Cir. 2012).

## II.      The First Clarification Motion

In their First Clarification Motion, the Plaintiffs attack paragraph 1(b) of the Court's First MSJ Order, which dealt with the ERISA plans' anti-assignment clauses. At first glance, it isn't clear whether the Plaintiffs are seeking *clarification* of the First MSJ Order or *reconsideration* of the Court's holding.[6] In reply, the Plaintiffs stipulate that they "are not asking the Court to reconsider or change its ruling" and insist that they're only looking to "clarify the nature, extent, and scope of [the Court's] Order[.]" Reply to First Clarification Motion at 1. But it's difficult to construe the Plaintiffs' specific requests as anything but a motion for *reconsideration*. Either way, the Plaintiffs don't (1) proffer any new evidence (except for one immaterial item), (2) cite any change in the controlling law, or (3) describe any extraordinary circumstances. So, they aren't entitled to reconsideration (if that's what they're after).[7]

---

[6] Adding to the confusion, the Plaintiffs cite "Fed. R. Civ. P. 59(e) and/or 60(b)" without explaining how they meet the elements of either or specifying which subsection of Rule 60(b) they intend to invoke. *See generally* First Clarification Motion.
[7] Since the Court's First MSJ Order isn't a final decision, we'd hesitate to grant relief under Rule 60 anyway. *See Firestone Bldg. Prod.*, 750 F. App'x at 783 n.4.

With all that aside, we'll do our best to answer the Plaintiffs' remaining questions about paragraph 1(b).

*First*, the Plaintiffs point out that, in the First MSJ, the Defendants cited only 32 out of "a still unknown total number of plans." First Clarification Motion at 3. In this way, the Plaintiffs seem to imply that there might be *other* plans out there—some even with anti-assignment clauses—not subject to the Court's First MSJ Order. If that's the point, then there's nothing to clarify (let alone amend or correct). As the Court explained at the First MSJ Hearing, the law is clear that the anti-assignment clauses prevented the Plaintiffs from standing in the shoes of the insureds—whether to sue for ERISA plan benefits or anything else. *See* First MSJ Hr'g Tr. at 9:5–7. In any event, if there is such a magical plan out there—*i.e.*, one that, despite its anti-assignment clause, elides the outer boundaries of our First MSJ Order—then the Plaintiffs should have appended it to their motion. Since they didn't, we can safely assume that the magical plans the Plaintiffs have imaged don't exist—and that the 536 claims they've now submitted are the only ones that aren't barred by anti-assignment clauses.

Nor is there any way for the Plaintiffs to circumvent those clauses through the doctrines of waiver and consent. At the First MSJ Hearing, the Plaintiffs spoke generally about federal decisions "holding that sometimes consent is a factual issue"—insinuating thereby that the Defendants, in some instances, may have waived the anti-assignment clauses or otherwise consented, despite those clauses, to the claims' assignments. *Id.* at 11:7–8; *see also* Pls. First MSJ Response [ECF No. 163] at 13–14 ("United consented to patients assigning benefits to Plaintiffs and United is responsible for paying such claims."). But, as the Court pointed out at the hearing, the Plaintiffs didn't proffer *any evidence* of waiver or consent—a point Plaintiffs' counsel readily conceded. *See* First MSJ Hr'g Tr. at 12:3–8 ("THE COURT: All right. So, none of the declarations of your witnesses, your own witnesses, ever say that in any letter, any email, or even any phone call anyone from United waived or consented to an assignment contrary to the stipulations in the provisions of the plans, correct? MR. BALDWIN:

Correct, your Honor."). Even today, more than 18 months later, the Plaintiffs still haven't proffered any evidence of waiver or consent. *See generally* First Clarification Motion.[8] This issue, in short, has been settled.

*Second*, the Plaintiffs ask the Court to amend its First MSJ Order as it relates to the power-of-attorney agreements—actually, they want us to omit this portion entirely—because the "Plaintiffs have not brought any claims pursuant to any powers of attorney." First Clarification Motion at 4. This request is difficult to reconcile with the Plaintiffs' litigation strategy *both* at the hearing *and* in their First MSJ briefing. In both contexts, the Plaintiffs *expressly* argued that the power-of-attorney agreements permitted them to circumvent the anti-assignment clauses. *See* Pls. First MSJ Response at 14 (stating that the "assignment of benefits obtained by Plaintiffs in this case also gives Plaintiffs power of attorney to bring suit against United as the patient's agent. . . . This is a limited power of attorney and is sufficient to confer standing."). In our First MSJ Order, we rejected that argument—nothing more, nothing less. *See* First MSJ Order ¶ 1(b) ("The Court finds unpersuasive the Plaintiffs' arguments that the Defendants either (1) waived these non-assignability provisions or (2) complied with them by receiving from the patients certain powers of attorney."). The Court sees no reason *not* to resolve one of the parties' disputes—and the Plaintiffs have offered none.

*Third*, the Plaintiffs suggest that some patients *may* have assigned *more* than just the right to sue for benefits. Here, they insist that the anti-assignment clauses should be construed narrowly—which

---

[8] The Plaintiffs do cite *one* new piece of "evidence"—a plan for an employee of the Federal Reserve Bank, *see* First Clarification Motion at 3—but it's not at all relevant here. The Plaintiffs, in fact, admit that the plan isn't even subject to ERISA. *See id.* ("Federal Reserve is an instrumentality of the federal government, and, hence, its employee benefit plans are government plans which are exempt from coverage under ERISA." (quoting *Berini v. Fed. Reserve Bank of St. Louis, Eighth Dist.*, 420 F. Supp. 2d 1021, 1030 (E.D. Mo. 2005) (cleaned up))). Worse, when the Defendants pointed out that this plan, too, has an anti-assignment clause, *see* Response to First Clarification Motion at 4 n.2, the Plaintiffs offered no rebuttal, *see generally* Reply to First Clarification Motion. As we've suggested, this "new" piece of evidence doesn't help the Plaintiffs at all.

is to say, construed as not precluding the assignment of those *additional* rights. *See* First Clarification Motion at 4–5. What are some of these extra rights? Well, the Plaintiffs argue that they *could* include the rights to sue the Defendants under § 1132(a)(2) (for breach of a fiduciary duty) or § 1132(a)(3) (for equitable relief). *Id.* at 4–7. This, though, is just another attempt to relitigate the anti-assignment question—again, without new evidence, new law, or extraordinary circumstances. It's worse, actually, because what the Plaintiffs are *really* asking for is leave to amend their complaint (a fourth time for those of you counting at home) so that they can advance some hypothetical claims under § (a)(2) or (3). But any close inspection of the Third Amended Complaint (or any of the various complaints before that) reveals that the Plaintiffs have *never* proceeded under those ERISA provisions. *See generally* State Court Complaint; Second Amended Complaint; Third Amended Complaint. We decline the Plaintiffs' invitation—five years into this litigation and months after the close of discovery and the ripening of summary judgment briefing—to (re)interpret the anti-assignment clauses in a way that would permit the Plaintiffs to shoehorn in causes of action they've never so much as hinted at before.

*Fourth*, the Plaintiffs parse the language of the governing plans in an ultimately futile effort to resurrect their now-rejected consent position. Starting with the word "consent," the Plaintiffs point out that some of the plans use the more specific phrase "written consent," while others use the word "consent" by itself. To the Plaintiffs, this indicates (1) that United "understood" the phrases to mean different things (otherwise the word "written" would be superfluous), and (2) that "consent"—when used by itself—must include *oral* consent. *See* First Clarification Motion at 7–9. The Plaintiffs also note that some policies use the words "our consent," whereas others deploy the phrases "consent of the 'claims administrator'" or "consent of 'United Healthcare.'" *Id.* at 9–10. This, they say, creates some salient ambiguity about which parties, representatives, or entities are invested with the authority to consent to the assignments. *Id.* at 10.

We're not persuaded. The Plaintiffs, let's not forget, could (and should) have highlighted these nuances of textual exegesis before, so there's not much more to say about them now, *see Stone*, 135 F.3d at 1442 ("The purpose of a Rule 59(e) motion is not to raise an argument that was previously available, but not pressed.")—other than that they wouldn't have mattered anyway. As we've explained, the Plaintiffs didn't proffer *any* evidence of consent (and they still haven't). They haven't shown, in other words, that *anyone* at United *ever* consented to the assignment of *any* of the plans at issue in this case. *See* First MSJ Hr'g Tr. at 12:3–8 ("THE COURT: All right. So, none of the declarations of your witnesses, your own witnesses, ever say that in any letter, any email, or even any phone call anyone from United waived or consented to an assignment contrary to the stipulations in the provisions of the plans, correct? MR. BALDWIN: Correct, your Honor."); *see generally* First Clarification Motion (not including *any* new evidence of consent). And, since they need *evidence* to survive summary judgment, their claims would fail *even* under the more permissive (re)interpretation they've offered.[9]

*Fifth*, the Plaintiffs argue that certain plans administered by the state-court Defendant, Empire Health Center, Inc. ("Empire"),[10] are subject to New York law. Under New York law, anti-assignment

---

[9] This (re)interpretation—though creative—isn't persuasive in any event. The Plaintiffs want us to read the plans *in pari materia*—as though the Defendants were some quasi-legislative body whose various contracts (with different employers over many years) were part of the same *corpus juris*. *Cf.* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252 (2012) ("[L]aws dealing with the same subject . . . should if possible be interpreted harmoniously."); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). But, for obvious reasons, that assumption breaks down when we apply it to private parties negotiating private contracts. Over the years, the Defendants signed hundreds (perhaps thousands) of these benefits contracts—each negotiated at arms-length—with different employers. Since each contract represented a distinct "meeting of the minds," we should expect some degree of variability between them—even if, on the whole, they bear a strong resemblance to one another. And that variability requires us to treat each contract separately—and on its own terms.

[10] Curiously, although the Plaintiffs named Empire in the state-court action, *see generally* State Court Complaint, they didn't include Empire in any of the amended complaints they filed here, *see generally* Second Amended Complaint; Third Amended Complaint.

provisions are "covenants." *Id.* at 9. But, for some reason—the Plaintiffs never explain why—New York law doesn't treat those covenants as vitiating the assignments. *Id.* Whatever the merits of this argument, the Plaintiffs are again attempting to relitigate the assignment issue with arguments they could have raised before. In any event, since the Plaintiffs never actually suggest that *any* of the remaining plans should be subject to New York law, *see generally id.*, it's not clear what they want. Note, in this respect, that the Plaintiffs offer no response to the Defendants' contention that the Empire claims aren't subject to ERISA *at all* because Empire is a New York health insurance program. *See* Response to First Clarification Motion at 8; *see generally* Reply to First Clarification Motion. And, of course, by failing to answer the point, the Plaintiffs have waived any argument they might've had. *See Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

For all these reasons, then, the First Clarification Motion is **DENIED**.

### III.     The Second Clarification Motion

In the Second Clarification Motion, the Plaintiffs address the Court's ruling in paragraph 1(c) of the First MSJ Order, which dismissed claims the Defendants denied for reasons having *nothing* to do with Dr. Ligotti's licensing or his (alleged) misrepresentations. *See* Second Clarification Motion at 1. In this second motion, the Plaintiffs insist that the Defendants didn't move for summary judgment on those grounds—and that, as such, they weren't on notice that the Court would be resolving that issue. *See id.* at 1–2. They also maintain that their Third Amended Complaint is "framed" as encompassing "all claims denied by United for any reason[.]" *Id.* at 1 n.1. In other words, the Plaintiffs argue that "the Court did not intend to render an adjudication on the merits of these claims but that it would instead not consider these claims." *Id.* at 1.

Here, the Plaintiffs have a point. Although the Court "dismissed" those insurance claims the Defendants denied for reasons *other* than those identified in the Third Amended Complaint, we didn't

intend to lay down a ruling *on the merits*. And we couldn't have done so in any event because those denials—which fall beyond the outer bounds of this litigation—weren't properly before us. To underscore this point, we should explain how we got here. In their Third Amended Complaint, the Plaintiffs allege that the Defendants improperly denied their insurance claims for one of three reasons. These reasons, again, were (1) that Dr. Ligotti didn't have an active license, (2) that his license couldn't be verified, or (3) that he'd misrepresented the nature of the services he was providing. *See* Third Amended Complaint ¶¶ 25, 28. It follows that claims the Defendants denied for *other* reasons (*e.g.*, because the claim was untimely or because the relevant service wasn't covered by the applicable plan) aren't at issue in this case—and thus couldn't have been "dismissed." We hereby clarify, then, that these *other* claims are *excluded* from trial, not *dismissed* on the merits.

One final point. We reject again the Plaintiffs' position that the Third Amended Complaint encompasses "all claims denied by United *for any reason*[.]" Second Clarification Motion at 1 n.1 (emphasis added). As we explained at the First MSJ Hearing, the Third Amended Complaint is pellucid that "the only thing [the Plaintiffs are] claiming for in these counts are for the two things listed in paragraph 63, which is denials for bad licensure and denials for alleged misrepresentations." First MSJ Hr'g Tr. at 36:15–18. Put another way, the Plaintiffs have been clear about why they're suing—and what they're suing for: the Defendants (they allege) "refused to pay a bill submitted by Plaintiffs based upon the false assertion that Plaintiff LIGOTTI *was not a licensed physician* and/or that *the services provided by Plaintiffs were misrepresented*." Third Amended Complaint ¶ 63 (emphasis added).

Now, it's true that, in paragraph 64 of the Third Amended Complaint, the Plaintiffs generally aver that the Defendants are "liable for unpaid benefits." *Id.* ¶ 64. Pointing to this more expansive phrasing, the Plaintiffs now ask the Court to interpret their complaint as seeking redress for *any* benefits claim United denied for *any* reason. But the Plaintiffs' reading of the complaint makes little sense. Were we to accept the Plaintiffs' new position that they're suing the Defendants for *every* claim

denial (whatever the reason), we'd render superfluous the many instances in which the complaint specifically enumerates *the kinds* of denials to which the Plaintiffs are here objecting. This we cannot do. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (footnote omitted)). The Plaintiffs' reading also violates a separate canon of construction: "that the specific governs the general." *Morales v. Trans World, Inc.*, 504 U.S. 374, 384–85 (1992).

Nor, we add, would the Plaintiffs' capacious construction of their complaint have been permissible under the Federal Rules. *See* FED. R. CIV. P. 8(a)(2) (requiring that a pleading contain "a short and plain statement of the claim *showing that the pleader is entitled to relief*" (emphasis added)). An ERISA plaintiff, after all, cannot sue for unpaid benefits unless he first explains *how* the insurer's actions were wrongful. *See Sanctuary Surgical Ctr., Inc. v. UnitedHealth Grp., Inc.*, 2013 WL 149356, at *3 (S.D. Fla. Jan. 14, 2013) (explaining that "benefits payable under an ERISA plan are limited to the benefits specified in the plan" and requiring that plaintiffs "at least identify the specific plan provisions under which coverage is conferred with respect to each of the derivative ERISA claims identified in its complaint, and [ ] allege sufficient facts to plausibly show the services rendered to each patient were indeed covered under that particular plan" (cleaned up)). While the Third Amended Complaint does explain *how* some of the denials were wrongful—specifically, those dealing with Dr. Ligotti's licensure and his alleged misrepresentations—it says absolutely nothing about the rest. *See* Third Amended Complaint ¶¶ 32–33, 35–39, 40, 47–48 (discussing wrongfulness of denials over licensure and alleged misrepresentations); *id.* ¶¶ 53, 63, 73, 83 (alleging that the Defendants violated ERISA because they wrongfully denied claims based on problems with Dr. Ligotti's licensure or his (alleged) misrepresentations).

We therefore **GRANT in part** the Second Clarification Motion and clarify *only* that the claims the Court purported to "dismiss" in paragraph 1(c) of the First MSJ Order are simply *excluded* from the trial, not *dismissed* on the merits. The Motion is **DENIED** in all other respects.

## MOTION TO VOLUNTARILY DISMISS DR. LIGOTTI

While the Defendants' renewed motion for summary judgment was pending, Dr. Ligotti moved to voluntarily dismiss himself from the case. *See* Motion to Voluntarily Dismiss Michael J. Ligotti as Party (the "Motion to Voluntarily Dismiss Dr. Ligotti") [ECF No. 247]. In support of this motion, Dr. Ligotti notes that the remaining claims are all payable (and owed) to WH, not to him—the implication being that he has nothing left to gain from this litigation. *See id.* at 2. But Dr. Ligotti has known about this for *at least* nine months, *see* Claims Spreadsheet (filed July 7, 2020), so the timing of his request is suspicious. And, because Dr. Ligotti cannot explain why letting him out of the case at this late juncture makes sense, we deny his motion.

The Court has substantial discretion to grant or deny a motion under Rule 41. *See* FED. R. CIV. P. 41(a)(2) (requiring a court order to dismiss the case at the plaintiff's request, except as provided in Rule 41(a)(1)); *Ortega Trujillo v. Banco Cent. Del Ecuador*, 379 F.3d 1298, 1301 (11th Cir. 2004) ("The district court grants a [Rule] 41(a)(2) dismissal only in its discretion[.]"). We decline to exercise that discretion here, not only because of Dr. Ligotti's delay, but also because (1) Dr. Ligotti's dismissal could, if the Defendants prevail, complicate their efforts to collect their fees and costs; (2) the dismissal might *later* require the Defendants to compel Dr. Ligotti's testimony by subpoena—a tricky business while he's under the shadow of a criminal indictment; and (3) if he did testify as a non-party, he could invoke his Fifth Amendment privilege *without* creating an adverse inference. *See generally* Response to Plaintiff's Motion to Voluntarily Dismiss Michael J. Ligotti as Party [ECF No. 248]. On the other side of the ledger, Dr. Ligotti hasn't shown that his continued presence in a case *he himself* started would prejudice him in any way.

Accordingly, the Motion to Voluntarily Dismiss Dr. Ligotti is **DENIED**.

## RENEWED SUMMARY JUDGMENT

When we denied the Defendants' First MSJ on the issue of administrative exhaustion, we did so *without* prejudice and gave the Defendants an opportunity to renew their arguments after some additional discovery. The Defendants have now filed their renewed motion for summary judgment, and it's ripe for resolution. *See* Motion for Summary Judgment ("Renewed MSJ") [ECF No. 224]; Plaintiffs['] Response in Opposition to Defendants' Motion for Summary Judgment ("Renewed MSJ Response") [ECF No. 230]; Defendants' Reply in Support of Motion for Summary Judgment ("Renewed MSJ Reply") [ECF No. 233].[11]

Of the 536 remaining claims, *see generally* Claims Spreadsheet, the Defendants move for summary judgment (based on the Plaintiffs' failure to exhaust administrative remedies) as to 493, *see* Renewed MSJ at 6. As for the other 43 claims, the Defendants searched their claim-tracking system and found that they *had* received *either* a request for reconsideration *or* a packet of documents that *could* be construed as an appeal. *See id.* at 8. To be clear, the Defendants don't concede that these 43 requests constituted proper appeals under the relevant plans; they simply acknowledge that, because of the evidence they've uncovered, they're not entitled to summary judgment as to those 43 claims. *Id.* In any event, for the reasons set out below, the Renewed MSJ is **GRANTED**.

## I.    The Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must

---

[11] The parties also filed statements of material facts, supporting exhibits, and responses to the opposing parties' submissions. *See* Defendants' Statement of Undisputed Material Facts ("Defs. SOMF") [ECF No. 223]; Parties' Joint Statement of Undisputed Facts ("Joint SOMF") [ECF No. 225]; Plaintiffs' Statement of Material Facts ("Pls. SOMF") [ECF No. 231]; Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts ("Defs. Response to Pls. SOMF") [ECF No. 234].

consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the movant bears the burden of proving the absence of a genuine issue of material fact, with all factual inferences drawn in favor of the non-movant. *See, e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the movant satisfies its initial burden, the burden shifts to the non-movant to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e).

The non-movant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must come forward with some affirmative evidence to support its claim. *See Anderson*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-movant "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50 (internal citations omitted).

## II.      The Law of ERISA Exhaustion

ERISA allows a participant or beneficiary of an employee benefits plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." § 1132(a)(1)(B). Before bringing such an action in district court, though, "the participant must 'exhaust available administrative remedies under their ERISA-governed plans.'" *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1314 (11th Cir. 2016) (quoting *Springer v. Wal–Mart Assocs.' Grp. Health Plan*, 908 F.2d 897, 899 (11th Cir. 1990)). Courts "strictly enforce" this exhaustion requirement—subject to "certain caveats reserved for exceptional circumstances." *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000).

The Eleventh Circuit has recognized exceptions to the exhaustion requirement "only when resort to administrative remedies would be futile or the remedy inadequate, or where a claimant is denied 'meaningful access' to the administrative review scheme in place." *Id.* at 1316 (cleaned up). To establish futility, though, a plaintiff must make a "clear and positive" showing. *See Bickley v. Caremark Rx, Inc.*, 461 F.3d 1325, 1330 (11th Cir. 2006). "[I]f nothing indicates that a plan administrator would have afforded a claimant less than an adequate legal remedy, a claimant who does not first attempt to use administrative remedies waives the futility argument." *Fla. Health Scis. Ctr., Inc. v. Total Plastics, Inc.*, 496 F. App'x 6, 12 (11th Cir. 2012) (citing *Bickley*, 461 F.3d at 1330); *see also Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1225 (11th Cir. 2008) ("In *Bickley*, we rejected an argument of futility as speculative because the participant had not attempted to pursue administrative remedies."). Ultimately, "[t]he decision of a district court to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision which [the Eleventh Circuit] review[s] only for a clear abuse of discretion." *Perrino*, 209 F.3d at 1315.

### III.   Analysis

### A.  The Evidence of Exhaustion

The Defendants contend that the governing plans required plan participants to appeal adverse benefits determinations, that those plans delineated precisely how those appeals must be initiated, and that—despite these clear requirements—the Plaintiffs failed to exhaust their administrative remedies. *See* Renewed MSJ at 6–7. Moreover, the Defendants add, when they denied the claims at issue here, they sent Explanation of Benefits ("EOBs") forms to the Plaintiffs. *Id.* These EOBs made clear that, if the Plaintiffs were interested in appealing the adverse decisions, they had to follow the steps outlined in the relevant plans. *See id.* ("[T]he EOB issued in response to each claim notified Plaintiffs of the need to follow the process for appeals in the member's (i.e., the plan participant's) benefit plan document.").

To substantiate these assertions, the Defendants offer a sampling of plans and EOBs, which they've appended to the Declaration of Ngoc Han Nguyen ("Nguyen Decl.") [ECF No. 223-1] at Exs. 4, 5, & 6. Ms. Nguyen is a legal services consultant who regularly accesses United's electronic records and compiles information about medical claims. *See id.* ¶ 2. She attests that she reviewed the remaining 536 claims at issue, *id.* ¶ 5, and found that "[t]he various plans for claims on the Claims Chart, as well as the EOBs, explain the appeals processes and also that it must be followed and exhausted prior to filing a lawsuit," *id.* ¶ 10.

Several of the plans, for example, include the sub-header "How to Appeal a Denied Claim" and use the following (or substantially similar) boilerplate:

> If you wish to appeal a denied pre-service request for Benefits, post-service claim or a rescission of coverage as described below, you or your authorized representative must submit your appeal in writing within 180 days of receiving the adverse benefit determination. You do not need to submit urgent care appeals in writing. This communication should include:
>
> - the patient's name and ID number as shown on the ID card;
> - the provider's name;

- the date of medical service;
- the reason you disagree with the denial; and
- any documentation or other written information to support your request.

*Id.* at Ex. 4, p. 253. And the plans reiterate that claimants must appeal within "180 days after receiving the adverse benefits determination." *Id.* at Ex. 4, p. 259. The plans remind claimants that "[y]ou cannot bring any legal action against [the employer] or the Claims Administrator for any other reason unless you first complete all the steps in the appeal process described in this section." *Id.* at Ex. 4, p. 260. Relatedly, the EOBs—which, again, are issued *after* the claim is denied—provide that "[t]he Member, provider, or representative may request reconsideration or appeal the decision by submitting comments, documents or other information to United Healthcare. If you are a network provider appealing a clinical or coverage determination on behalf of a member, or a non-network provider appealing a decision on behalf of a member, follow the process for appeals in the members benefit plan document." *Id.* at Ex. 3, p. 142.

Ms. Nguyen also attaches to her declaration a spreadsheet that lists each of the 536 claims at issue in this case and includes two important columns: one citing the documents (if there are any) that correspond to the particular claim; and a second indicating whether those documents qualify as an appeal under the governing plan. *See generally id.* at Ex. 1. Most claims (notably) don't come with *any* associated documents. *See generally id.* For the few that do, the spreadsheet includes the bates number of the corresponding documents and, in the next column, a note explaining whether those documents constitute a proper appeal. *Id.* In a separate spreadsheet and composite exhibit, Ms. Nguyen collects documents for claims that were ultimately rejected because "the[ ] submissions were either untimely or Plaintiffs were notified by United that the appeal could not be processed without submission of a written authorization from the patient." *Id.* ¶ 9.[12] Where the corresponding documents for a claim are

---

[12] *See, e.g., id.* at Ex. 3, p. 29 (letter from United stating that "[w]e received your appeal request on behalf of our UnitedHealthcare member listed above. However, pursuant to state and federal

inconclusive, the Defendants have given the Plaintiffs the benefit of the doubt and added that claim to the separate chart of 43 *unchallenged* claims. *Id.* at Ex. B. Those, of course, are the 43 claims on which we'll proceed to trial.

The Plaintiffs, it's true, produced to the Defendants hundreds of documents during the additional discovery period. These documents, the Plaintiffs say, constitute viable evidence of their many attempts to appeal the claims denials. But the Defendants have offered the Declaration of Marissa Crow ("Crow Decl.") [ECF No. 223-2], who manages the business processes within United's Appeals Department, who reviewed the documents the Plaintiffs produced in discovery, and who concluded that *none* of those documents constitutes a proper "appeal[]" under the governing plans, *id.* ¶¶ 2–3. Instead, according to Ms. Crow, the Plaintiffs' documents *all* fall into one of the following three categories (none having anything to do with appeals): (1) submissions that prompted United to ask the Plaintiffs for more information so that it could process the claim *in the first instance*; (2) submissions that may have been improperly billed and as to which United required the Plaintiffs to make some correction before the claim could be processed *in the first instance*; and (3) post-it notes, fax cover sheets, and EOB compilations that *nowhere* include any requests for appeal. *Id.* ¶ 3. Like Ms. Nguyen, Ms. Crow appends to her declaration certain exemplars that support her characterization of this evidence. *See id.* at Exs. 1, 2 & 3.

Against all this, the Plaintiffs advance a single argument—that, to justify summary judgment on any individual claim, the Defendants must show a failure to exhaust *that* claim. *See* Renewed MSJ Response at 4–5. In essence, the Plaintiffs contend that the Defendants' analysis of a "representative sample" of claims may entitle the Defendants to summary judgment on *those specific claims*. But, the

---

regulations, we require you to secure written authorization from the patient in order to submit the appeal on that patient's behalf," and appending an authorization form).

Plaintiffs insist, that sample shouldn't allow the Court to grant summary judgment on claims the Defendants *didn't* include in that sample.

We disagree with the Plaintiffs' characterization of the evidence. The Defendants haven't relied on mere samples, and they aren't asking the Court to assume that the claims outside their samples resemble the claims they included in those samples. To the contrary, they've provided the sworn testimony of two people who reviewed *all* the Plaintiffs' documents, who explained what's in *all* those documents, who found that most of those documents don't constitute appeals *at all*, and who *only then* offered representative samples of their work.

The Plaintiffs try to undermine Ms. Nguyen's declaration by citing the transcript of her February 13, 2020 deposition. *See* Renewed MSJ Response at 5. Based on that excerpt, they insinuate that Ms. Nguyen hasn't reviewed *all* the relevant documents. It's true that, when she sat for her deposition on February 13, 2020, Ms. Nguyen hadn't reviewed the many thousands of claims that were, *at that point*, still in play. *See* Feb. 13, 2020 Nguyen Depo. [ECF No. 230-9], at 9:16–18 ("Q: Did you review or research every claim at issue in this lawsuit? A: Not every claim, no."). But that deposition took place one day *before* the First MSJ Hearing, where the Court instructed the parties to narrow the universe of (potentially) viable claims. *See* First MSJ Order ¶ 2(a), (c). Ms. Nguyen signed her declaration (on which the Defendants now rely) on August 14, 2020, *see* Nguyen Decl. at 3—six months *after* the landscape of available claims had been reduced from several thousand to 536. She thus had six months—from February to August—to review those 536 claims, and the Plaintiffs never explain why they think she couldn't have completed this task in that timeframe. *See generally* Renewed MSJ Response.

Similarly, in a footnote, the Plaintiffs half-heartedly attack Ms. Crow's declaration, complaining that "[t]he Declaration of Marissa Crow is Plaintiff's first introduction to this person as her identity, role or position within United was never previously disclosed during discovery." Renewed MSJ

Response at 5 n.2. But they never explain why Ms. Crow's recent appearance renders her declaration inadmissible under Rule 56(c)(4), which requires only that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." They've thus waived any such argument, *see In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."), and we'll consider Ms. Crow's testimony under Rule 56(c)(1)(A), which says: "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including . . . affidavits or declarations[.]"[13]

For all their handwringing about Mmes. Nguyen and Crow, moreover, the Plaintiffs don't contend that the Defendants' samples are in any respect non-representative or inaccurate. *See generally* Renewed MSJ Response. And we can safely assume that the Plaintiffs can't identify even a single claim of the remaining 493 that contradicts Mmes. Nguyen and Crow's assessments because, if one such claim did exist, the Plaintiffs would've said so. Nor, for that matter, have they identified any such conflicting EOB. Instead, treating summary judgment like a course on metaphysics, the Plaintiffs say only that the Defendants *cannot* prove the EOBs "*always* contain[ed]" the required information. *See id.* at 5 (emphasis added). But they (notably) submit *no* EOBs that *omit* this required information. *See generally id.*

To this point, we note that the Plaintiffs had plenty of chances—and more than enough time—to dig up and produce favorable documents. *Cf. Williamson v. Travelport, LP*, 953 F.3d 1278, 1290 (11th Cir. 2020) (explaining that a plan administrator "cannot artificially limit the administrative record at the outset based on its own assessment of relevance"); *Est. of Bratton v. Nat'l Union Fire Ins.*

---

[13] The Plaintiffs also didn't move to strike or otherwise exclude Ms. Crow as an undisclosed witness under Rule 37(c)(1).

*Co. of Pittsburgh, P.A*, 215 F.3d 516, 521 (5th Cir. 2000) ("[T]he claimant must be afforded a reasonable opportunity to contest whether that record is complete."). They were, after all, on notice that exhaustion would be an issue—perhaps the biggest issue—at summary judgment since we discussed the topic extensively at the First MSJ Hearing. At that hearing, we ordered the parties to produce *any* appeals-related documents in their possession. *See* First MSJ Order ¶ 2 (requiring both parties to "produce all evidence in their possession concerning any appeals of any claims" and ordering the Defendants to "produce all the relevant plans"). In the interim, the Plaintiffs never complained that the Defendants were withholding documents, *see generally* Docket (showing no discovery-related motions between March 2, 2020, when the Court issued the First MSJ Order, and August 13, 2020, when the Defendants filed their Renewed MSJ), and they don't now suggest that the record is somehow incomplete, *see generally* Renewed MSJ Response. The Plaintiffs, in short, have no excuse for failing to adduce *some* evidence in opposition to the Defendants' detailed spreadsheets and declarations.

The Plaintiffs also cite no legal authority for their view that the Defendants had some obligation to attach to their Renewed MSJ *every* plan (rather than just a representative sample). *See generally* Renewed MSJ Response. Nor could they. "A representative or statistical sample, like all evidence, is a means to establish or defend against liability[.]" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–55 (2016). In the end, since both parties had access to *all* the documents—and given how voluminous those documents are—it would have been tedious and wasteful for the Defendants to attach, cite to, and quote from every single page. *See* FED. R. EVID. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."). Even so, we reiterate the central point: The Defendants' witnesses reviewed *every* page of the 493 remaining claims and *only then* provided the

Court with representative samples of what they reviewed. There's nothing wrong with that—and the Plaintiffs have pointed to no case, statute, or rule for the proposition that there is.

The Defendants, then, have met their initial burden at summary judgment: They've come forward with evidence that the governing insurance plans had appeals requirements; that the corresponding EOBs instructed the Plaintiffs to follow those requirements; and that, of the 536 claims on the spreadsheet, 493 either (1) have no corresponding documents or else (2) include documents that are wholly unrelated to the appeals process. And the Plaintiffs never dispute any of this evidence *with evidence* of their own. They don't, for instance, with respect to any individual claim, say anything like: "We disagree with the Defendants' conclusion about Claim Y. Here is document X, which shows that we exhausted the appeals requirement under the plan governing Claim Y." Instead, they cite a few composite exhibits[14] and insist that a genuine dispute arises, like magic, from the sheer "volume of documents [they] submitted for appeal." Renewed MSJ Response at 7.[15] But summary judgment doesn't turn on the volume of evidence a party produces; it turns on the quality—in particular, the relevance—of that evidence.

So, while the Plaintiffs say they "dispute" the Defendants' factual assertions, they (1) don't lay out any basis for their disputes, (2) fail to cite any supporting evidence for their objections, and (3) repeatedly cite irrelevant evidence. These disputations are thus plainly insufficient as a matter of law. *See* FED. R. CIV. P. 56(c)(1) (requiring a party who asserts that a fact is genuinely disputed to "support the assertion by" citing evidence); S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement

---

[14] We remind the Plaintiffs that "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.").

[15] The Plaintiffs proudly tell us that they "produced 2,545 documents regarding appeals." Renewed MSJ Response at 7.

of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that . . . the Court finds that the material fact at issue is *supported by properly cited record evidence*[.]" (emphasis added)); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) ("There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."). So, for instance, the Plaintiffs "dispute" the Defendants' contention that the 43 unchallenged claims are "the only claims on the Claims Chart for which United has any record of receiving any type of appeal or reconsideration request from Plaintiffs[.]" Pls. SOMF ¶ 18 (disputing Defs. SOMF ¶ 18). In support, the Plaintiffs cite *only* the Declaration of Marilyn Pressley. *See id.* (citing Pressley Decl. [ECF No. 230-5]).[16] But Ms. Pressley executed the declaration on January 10, 2020, *see* Pressley Decl. at 9, which was well before the parties, having narrowed the universe of available claims, submitted a spreadsheet with only 536 claims. Ms. Pressley thus couldn't have opined *in January of 2020* about the Defendants' *later* assertion that, of the *remaining* 536 claims, only 43 were appealed.[17] Instead, to properly challenge paragraph 18 of the Defendants' Statement of Material Facts, the Plaintiffs needed to submit examples of documents that (1) correspond to one of the 493 disputed claims and (2) qualified as an appeal. Again, they did no such thing—presumably, because no such documents exist.

Lacking any documentary evidence, the Plaintiffs fall back on phone calls (they say) they made to the Defendants—calls that, in their view, qualify as appeals under the governing plans. *See* Renewed MSJ Response at 7. On this point, which came up at the First MSJ Hearing, the Court hinted that the Plaintiffs would need to match up their evidence with those plans that (purportedly) allowed oral appeals. *See* First MSJ Hr'g Tr. at 38:20–25 ("The COURT: . . . I just mean that for those for whom

---

[16] Never mind that the Plaintiffs cite the *entire* 31-paragraph declaration without ever pretending to specify which paragraphs or sentences they think are relevant.

[17] (or, at least, *may* have been).

you have no written appeal and no evidence that there was any oral appeal for that individual patient -- because, again, it's not sufficient to say, Oh, I called sometimes and tried to get -- you have to say, Okay, for patient Shaheed, I called to appeal, and I was told whatever I was told."); *id.* at 52:18–53: (counsel representing that "[t]here's other plans that I've seen that it had said that we suggest that you make an appeal in writing, but you may make it orally," and the Court responding "[b]ut we don't have any sense of the number of people out of the total number that are going to be allowed to go forward for whom that's true").

Again, though, the Plaintiffs don't bother to tie the (alleged) oral appeals to any specific claims or plans. *See generally* Renewed MSJ Response. Instead, they attach two ERISA plans, *see id.* at Ex. B, which (they say) permitted oral appeals. And they offer the testimony of Ms. Pressley, their "insurance biller," who attests that, in the ordinary course of business, "[i]f a Claim was denied or not paid, I would seek the instruction of these [insurance] representatives as to how to submit an appeal to have the Claims processed and ask the representatives to appeal the denial over the telephone." Pressley Decl. ¶ 14. But Ms. Pressley goes on to explain that:

> I have been told and reviewed instructions on multiple occasions indicating that to submit an appeal, I had to follow the particular instructions provided by the health insurer, which I would do in the ordinary course of business as part of my custom and practice on a regular basis. This included but was not limited to, mailing in medical records, resubmitting a Claim, making a correction on a Claim, faxing or mailing proof of timely filing, and/or sending in a copy of the rendering provider and Whole Health licensure and tax identification information.

*Id.* ¶ 15. In other words, Ms. Pressley *doesn't* say that a United representative ever told her that she could appeal by phone—nor does she allege that a United representative ever acknowledged that her phone call triggered a proper appeal. To the contrary, as Ms. Pressley explains, the representatives repeatedly instructed her to follow the plan provisions, which (at least with respect to the plans the parties have submitted on this record) unambiguously required Ms. Pressley to submit her appeals in writing. *See* Nguyen Decl. at Ex. 4, p. 253 (plan stating that, "[i]f you wish to appeal a denied pre-

service request for Benefits, post-service claim or a rescission of coverage as described below, you or your authorized representative must submit your appeal *in writing* within 180 days of receiving the adverse benefit determination" (emphasis added)).

Now, Ms. Pressley does add that she routinely followed United's appeals requirements, and that, in doing so, she submitted her appeals in writing. *See* Pressley Decl. ¶ 15. But neither Ms. Pressley nor anyone else describes the *specific claims* denials she's talking about. Here, again, the timing of Ms. Pressley's declaration is important. Recall that Ms. Pressley signed her declaration in January of 2020, *before* the First MSJ Hearing, when the parties were still fighting over thousands of disputed claims. The parties didn't then narrow the universe of remaining claims to 536 until July 7, 2020, when they submitted their Claims Spreadsheet. But Ms. Pressley never executed a second declaration. Nor has she since explained whether she *ever* appealed (in writing) any of the 493 still-disputed claims (as opposed to other, undisputed or irrelevant claims). So, on this record, the only plausible inference we can draw is that the denials she says she appealed *in writing* were some combination of (1) denials of claims the Court already dismissed in its First MSJ Order, (2) the 43 denials the Defendants aren't challenging, or (3) other denials that have *nothing* to do with this case—which is to say, claims the Defendants denied for reasons having nothing to do with Dr. Ligotti's licensure or his (alleged) misrepresentations.[18] It's worth repeating, then, that, in the face of the meticulous compilations the Defendants have presented, the Plaintiffs have submitted *no evidence* from which this Court might reasonably infer that Ms. Pressley (or anyone else) ever appealed the 493 *disputed* denials in writing.

As for the two plans the Plaintiffs attach to their composite exhibit, one doesn't even allow for oral appeals—*see* Renewed MSJ Response, Ex. B at 2 ("If you disagree with our decision after

---

[18] This has happened before. At the First MSJ Hearing, in fact, the Plaintiffs submitted documents that, at least at first glance, appeared to constitute appeals. *See* First MSJ Hr'g Tr. at 86:3–4. On closer inspection, though, it became clear that these appeals had "nothing to do with [this] case." *Id.*

following the above steps, you can ask us *in writing* to formally reconsider your complaint." (emphasis added))—except in limited circumstances when the patient "requires immediate action" because "a delay in treatment would significantly increase the risk to [the patient]," *id.* The Plaintiffs never argue that this (very narrow) exception applies to the claims at issue here, *see generally* Renewed MSJ Response—nor could they.[19] They're suing, after all, as assignees of patients who *already* obtained Dr. Ligotti's medical services—not patients who, because of a *delay* in treatment, were at increased risk of harm.

As for the second plan, the Defendants concede that it permits oral appeals—for certain kinds of denials. *See* Renewed MSJ Reply at 3. But (again) the Plaintiffs don't say whether this plan governs any of the 493 still-disputed claims. *See generally* Renewed MSJ Response. Indeed, after some digging, the Defendants contend (and the Plaintiffs never dispute) that this particular plan governs *only* Claim #456—which (wait for it) is one of the 43 *unchallenged* claims. *See* Renewed MSJ Reply at 3. Neither plan, in short, helps the Plaintiffs here.

One final example: The Plaintiffs "dispute" the Defendants' assertion that "the various plans and EOBs explain that the appeals processes must be followed and exhausted prior to filing a lawsuit." Defs. SOMF ¶ 10; *see also* Pls. SOMF ¶ 10 ("Disputed. Plaintiffs disagree with United's characterization that all plan[s] and EOBs explained the appeals process and that all plans had language that appeals must be exhausted prior to filing suit."). In support of this "dispute," though, the Plaintiffs rely only on the same two composite exhibits, A and B. For three reasons, neither exhibit saves the Plaintiffs here.

*First*, neither exhibit includes a complete plan. Instead, cobbled together, the two exhibits contain a mishmash of 52 plan *pages*—taken, it seems, from 14 *different* plans. And, because none of

---

[19] Again, they've thus waived any such argument. *See Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

the excerpts is separated from the others by headers, sections, or dividers of any kind, we've had to go through each excerpt one-by-one and take an educated guess about where each one ends and the next begins. The mindless stream-of-consciousness with which these excerpts were put together would be bad enough. But the Plaintiffs then decided not to cite *any* specific excerpts (or portions of excerpts) in support of their "dispute" of fact. Let's be clear about what we mean here: The Plaintiffs are contesting what could have been a critical fact in the case. Rather than cite a specific plan for their position, though, they refer only generally to the 52-page soup of plans they've appended. What's worse, even if these plan excerpts helped the Plaintiffs—as we'll see in a moment, they don't—the Plaintiffs never tie these excerpts to *any* of the 493 extant claims. For that reason, even if one of these plan excerpts had said something like "YOU DO NOT HAVE TO EXHAUST YOUR ADMINISTRATIVE REMEDIES OR APPEAL AN ADVERSE BENEFITS DETERMINATION IN ANY WAY BEFORE YOU FILE YOUR LAWSUIT IN FEDERAL COURT," we'd have no reason to believe that this excerpt comes from a plan that governs one of the remaining 493 claims.[20] It's therefore not clear that any of these free-floating excerpts is even remotely relevant to our case. The Plaintiffs' disputation, in other words, is so procedurally improper that the Court can (and should) treat *the Defendants'* asserted fact as admitted. *See* S.D. FLA. L.R. 56.1(b)(2) (requiring that statements of material facts "[c]onsist of separately numbered paragraphs, limited as far as practicable to a single material fact, with each fact supported by specific, pinpoint references to particular parts of record material," and explaining that, "[w]hen a material fact requires specific evidentiary support, a general citation to an exhibit without a page number or pincite (e.g., "Smith Affidavit" or "Jones Deposition" or "Exhibit A") is non-compliant"); *see also Matter of Brizo, LLC*, 437

---

[20] As we've said, that excerpt could have come from a plan that governs one of the 43 claims the Defendants aren't challenging, or it could have come from one that governed a claim the Court has already dismissed or a claim that has nothing to do with this case..

F. Supp. 3d 1212, 1215 n.3 (S.D. Fla. 2020) (deeming a fact admitted, and not genuinely disputed, when the opponent "vaguely reference[d] evidence without pincite citations and [did] not provide exhibits in a format the Court can readily review").[21]

*Second*, contrary to the Plaintiffs' contention that some of the plans didn't "explain[] the appeals process," Pls. SOMF ¶ 10, we've reviewed each of the excerpts in Exhibits A and B and now conclude that *all the excerpted plans* made at least one thing clear: United implemented specific procedures for claimants to follow in appealing adverse benefits determinations.[22] So, if the universe of relevant plans includes a plan without these review procedures, the Plaintiffs haven't submitted it.

*Third*, the Plaintiffs have failed to invoke—or advance any arguments for—the only exception that could have helped them here. That exception—admittedly narrow to begin with—comes from

---

[21] This procedural impropriety applies with equal force to several of the Plaintiffs' *other* "disputes" of fact. *See, e.g.*, Pls. SOMF ¶ 1 (citing generally to "ECF 223-1, Declaration of Ngoc Han Nguyen" without a pincite); *id.* ¶ 18 (using a "see generally" cite to "ECF 230-5, Declaration of Marilyn Pressley"); *id.* ¶ 19 (citing to "ECF 164-2, 2nd Decl. of Shaheed, Comp. Ex A" without a pincite).

[22] *See* Renewed MSJ Response, Ex. A at 2 ("To resolve a question, complaint, or appeal, just follow these steps: . . . If you disagree with our decision after following the above steps, you can ask us in writing to formally reconsider your complaint."); *id.* at 5 ("The following is a general summary of the claims and appeals process for the Morgan Stanley benefit plans."); *id.* at 12 ("If you wish to appeal a denied eligibility claim, you or your authorized representative must submit your appeal to the Caterpillar Inc. Benefit Appeals Committee in writing within 180 days of receiving the eligibility claim denial[.]"); *id.* at 22 (giving claimants the "Right To A Formal Review Of An Adverse Benefit Determination" if they file "written comments, documents, records, and any other information relating to [their] claim for benefits," and permitting "voluntary appeal of any adverse medical benefit determination made at the mandatory appeal stage"); *id.* at 26 ("This chapter describes the process and the deadlines for appealing a claim that has been partially or fully denied in [various areas of coverage]. To protect your right to appeal, it's important to follow these procedures and meet the deadlines."); *id.* at 42 ("You have the right to appeal an adverse benefit determination . . . . You or your authorized representative must file your appeal in writing within 180 calendar days after you receive notice of the denial or rescission. You will have the opportunity to submit written comments, documents, records, and other information supporting your claim."); *see also id.*, Ex. B at 2 ("To resolve a question, complaint, or appeal, just follow these steps: . . . If you disagree with our decision after following the above steps, you can ask us in writing to formally reconsider your complaint. If the complaint relates to a claim for payment, your request should include: . . . ."); *id.* at 5 ("To resolve a question, complaint, or appeal, just follow these steps: . . . All requests for an appeal should include: . . .").

*Watts v. BellSouth Telecommunications, Inc.,* 316 F.3d 1203, 1204–06 (11th Cir. 2003), where the Eleventh Circuit excused an ERISA plaintiff from the usually-stringent exhaustion requirement. In that case, the governing ERISA plan contained two contradictory provisions—one commanding the claimant to exhaust his administrative rights to appeal and a second describing the claimant's right, when his claim has been denied, to sue the insurer in federal court. *Id.* at 1208. These conflicting clauses rendered the plan ambiguous—and made the claimant's subjective interpretation reasonable. *Id.* Since the insurer had drafted the plan, the court construed these ambiguities in favor of the unexhausted claimant. *Id.* (citing *Lee v. Blue Cross/Blue Shield of Ala.,* 10 F.3d 1547, 1551 (11th Cir. 1994), for the proposition that "ambiguities in the summary plan description and plan [are] construed against the drafter").

In our case, every plan the Plaintiffs have excerpted outlines the specific steps a claimant must take to appeal a denied claim. *See generally* Renewed MSJ Response at Exs. A & B. And many of these excerpts unambiguously require claimants to exhaust their internal appeals *before* filing suit.[23] Now, it's true that *some* of these excerpts don't explicitly warn claimants that, before filing suit, they must exhaust their administrative remedies. But that silence, standing alone, is insufficient to satisfy the *Watts* exception, which requires "proof by the plaintiff of three elements: (i) the relevant plan documents objectively speaking could reasonably be interpreted as permitting the plaintiff to file a lawsuit without exhausting administrative remedies, (ii) that the plaintiff interpreted the documents that way, and (iii)

---

[23] *See* Renewed MSJ Response, Ex. A at 8 ("You may not bring a lawsuit to recover benefits under a benefit plan until you have exhausted the plan's administrative process described in this SPD."); *id.* at 19 ("You cannot bring any legal action against Caterpillar Inc., the Plan, the Plan Administrator, or the Claims Administrator for any other reason unless you first complete all the steps in the claims and appeal process described in this section."); *id.* at 27 ("You may not file a lawsuit for benefits if the initial claim or appeal is not made within the time periods set forth in the claims procedures of the Plan."); *id.* at 37 ("You cannot take any legal action until you have exhausted the Plan's claims review procedure described above."); *id.* at 44 ("You must exhaust these claim procedures before pursuing legal action with respect to a claim for Medical Plan benefits.").

that as a result of the misinterpretation, the plaintiff failed to exhaust the administrative process."

*Johnson v. Liberty Life Assur. Co. of Bos.*, 2015 WL 248944, at *6 (M.D. Ala. Jan. 20, 2015). Even if we

agreed that these excerpted plans were ambiguous—we don't[24]—the Plaintiffs (who never mention

*Watts*, let alone invoke its three-part test) offer no argument or evidence for the latter two elements.

So, for instance, they introduce no evidence to support the proposition that they *subjectively* believed

they could file suit *without* first exhausting their internal remedies. *See Spivey v. Southern Co.*, 427 F. Supp.

2d 1144, 1157 (N.D. Ga. 2006) ("Even if this Court were willing to read the relevant Plan documents

as susceptible to a reasonable construction that no exhaustion was required in this case . . . Plaintiff

has come forward with no evidence that *he* entertained that construction, or that it was that erroneous

reading of the Plan that led him to fail in his duty to present his claims for administrative review. The

absence of such proof, at this stage of the litigation, is fatal to his claim."); *Lytle v. Lowe's Home Ctrs.,*

*Inc.*, 2014 WL 1689279, at *13 (M.D. Fla. Apr. 29, 2014) (finding the *Watts* exception inapplicable

where the claimant was "not arguing that she was unaware that exhaustion of administrative remedies

was required before filing a lawsuit"). To the contrary, our Plaintiffs insist that they took "all necessary

steps known to [them] to exhaust administrative appeals or denials." Third Amended Complaint ¶ 29.

This allegation strongly suggests that the Plaintiffs were very much aware of their obligation, under

---

[24] "[E]ssential to the holding in *Watts* was the fact that multiple provisions of the plan at issue, when read *in conjunction with one another*, failed to establish the exhaustion requirement." *Bojorquez v. E.F. Johnson Co.*, 315 F. Supp. 2d 1368, 1375 (S.D. Fla. 2004). In *Watts*, remember, one of the clauses discussed the appeals process, while a second appeared to give the claimants carte blanche to file their claims in federal court. *See Watts*, 316 F.3d at 1208 ("The summary plan description tells participants that they 'may use' the administrative appeal procedure if their claim is denied and they 'wish to appeal' and, on the very next page, states that claimants 'may' file a suit in federal court if their claim is denied."). It's that second, conflicting clause that's missing here. None of the excerpts we've reviewed includes any similarly-contradictory provision—and the Plaintiffs never say that they do. Instead— and, again, since the Plaintiffs never invoke *Watts*, we're really making this argument for them—the Plaintiffs' "dispute" appears to hover around the *absence* of language, specifically, the absence of any admonition about a claimant's obligation to exhaust before filing suit. None of the excerpted plans, then, meets the "objective" standard the Eleventh Circuit laid out in the first element of the *Watts* test.

the plans, to exhaust their administrative remedies *before* filing suit. *See Bojorquez*, 315 F. Supp. 2d at 1375 (declining to apply the *Watts* exception where the complaint "state[d] that[] 'Plaintiff has made all appropriate and reasonable attempts to exhaust his administrative remedies under the plan,'" as that allegation "acknowledges that Plaintiff was required to exhaust his administrative remedies prior to filing suit and casts doubt upon Plaintiff's recent assertion that he was not aware of the exhaustion requirement and should be excused from it").

For all these reasons, then, the Plaintiffs' "disputes" of fact are neither genuine nor material.

**B.     The Exhaustion Burden**

Interestingly, neither side addresses the antecedent question of *who* bears the burden of proving exhaustion. *See generally* Renewed MSJ; Renewed MSJ Response. Some courts treat exhaustion as an affirmative defense that need not be pled in the complaint or established by the plaintiff at trial. *See, e.g.*, *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp. 3d 982, 1004 (D. Kan. 2018) (collecting cases and noting that "several other circuit courts have held that ERISA's exhaustion requirement is not jurisdictional, but is an affirmative defense," and explaining that a plaintiff is "not required to plead exhaustion"). Others require the plaintiff to plead exhaustion in the complaint, *even though* they view exhaustion as an affirmative defense. *See Neurological Surgery, P.C. v. Aetna Health Inc.*, 2021 WL 26097, at *19 (E.D.N.Y. Jan. 4, 2021) ("Plaintiff correctly notes that exhaustion is an affirmative defense and the Defense's 'burden to prove.' But Plaintiff incorrectly asserts that, therefore, 'an ERISA plaintiff is not even required to plead that it exhausted its administrative remedies.'" (internal citations omitted)). And at least one court has suggested that the plaintiff must plead *and* prove exhaustion. *See Smith v. Hartford*, 2020 WL 4815143, at *3 (N.D. Ala. Aug. 19, 2020) ("[T]he plaintiff must carry the burden of proof, demonstrating that she is entitled to recover under ERISA's civil enforcement provision and that she exhausted the administrative claim and appeal procedures available under the pension and

severance plans and must plead exhaustion before filing suit to obtain relief under ERISA." (cleaned up)).

While the Eleventh Circuit hasn't weighed in on which side (plaintiff or defense) must prove exhaustion *at trial*, it has held that an ERISA plaintiff must plead exhaustion in his complaint. *See, e.g.*, *Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042 & n.1 (11th Cir. 1995) (explaining that a plaintiff must "plead[] or recite[] facts showing that [it] had exhausted its administrative remedies under the plan," and adding that a plaintiff fails to satisfy this exhaustion requirement when it, in conclusory fashion, asserts that it "complied with all conditions precedent" or that "such conditions have been waived or excused"). Since an ERISA plaintiff must plead exhaustion in his complaint, we think it makes sense to say that he must later substantiate the complaint's exhaustion allegations *with evidence* if he's to survive summary judgment.

Either way, though, the Defendants are entitled to summary judgment here. If the burden of proof is on the Plaintiffs to prove exhaustion, then the Defendants have established the *absence* of a material fact on that issue—at least with respect to the 493 still-disputed claims. *See* FED. R. CIV. P. 56(c)(1) ("[A] party asserting that a fact cannot be . . . disputed must support the assertion by: . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, *or that an adverse party cannot produce admissible evidence to support the fact.*" (emphasis added)); *see also Celotex*, 477 U.S. at 324–25 (explaining that the movant is not required to *negate* his opponent's claim; he may discharge his burden by merely "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case," a showing that then shifts the burden to the non-moving party, who must "go beyond the pleadings" by pointing to "specific facts showing that there is a genuine issue for trial").

If, on the other hand, the Defendants bear the burden of proving exhaustion,[25] then they've offered plenty of competent evidence for their position that the Plaintiffs didn't exhaust. This evidence includes, as we've said, the sample plans and EOBs, the declarations of Mmes. Nguyen and Crow about the requirements of the governing plans and the contents of the Plaintiffs' documents, and the Claims Spreadsheet, which juxtaposes the specific claims denials against the bates-stamped documents that correspond to them. By contrast, the Plaintiffs haven't come forward with *any* viable evidence to "call into question the inference created by the movant's evidence[.]" *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) ("For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact."). That's really the end of the matter.

## C.    The Plaintiffs' Remaining Exhaustion Arguments

The Plaintiffs' two remaining exhaustion arguments are mostly unsupported and frivolous. We address each in turn.

*First*, the Plaintiffs chastise the Defendants for taking the "blanket position that all appeals must be completed in the same fashion," and argue that, because at least two of the plans carry different appeals procedures, the Defendants have "repudiat[ed] the actual terms of the plan [they] now seek[] to enforce." *See* Renewed MSJ Response at 5 (citing Composite Exs. A & B). Although they don't say so directly, the Plaintiffs seem to suggest that, by construing the governing plans as requiring written appeals, the Defendants have repudiated those plans that allowed for oral appeals. But the Defendants aren't denying that *some* plans permitted oral appeals. Rather, they contend that, of the plans that governed the 493 still-disputed claims—that is, of the plans that are relevant here—

---

[25] The Defendants raised exhaustion as an affirmative defense. *See* Defendants' Answer and Affirmative Defenses to Plaintiffs' Third Amendment Complaint [ECF No. 109] at 12.

*none* permitted oral appeals. It may be, in other words, that *other* plans governing *other* claims countenanced oral appeals. But the Plaintiffs had to show that at least one of the plans that governed the still-outstanding claims allowed for oral appeals—and, as we've said, they haven't done that.[26]

*Second*, the Plaintiffs lament that "United is essentially arguing that only United can determine what is an appeal and whether the plan appeal process was followed." *Id.* at 7; *see also id.* at 4 ("Perhaps even more vexing is that United's position in its Motion is that United is the only one with authority to determine if the plan was followed."). Again, the Plaintiffs mischaracterize the Defendants' position. The Defendants aren't suggesting that they—and only they—get to decide whether an appeal was proper under the plans. They are, rather, simply following the procedures outlined in the Federal Rules, which permit defendants to move for summary judgment by presenting evidence in support of their position. In this case, the Defendants' evidence establishes *both* that the governing plans required exhaustion *and* that the Plaintiffs failed to abide by those requirements before filing suit. They thus invited the Plaintiffs to rebut or oppose this evidence with evidence of their own. As we've explained, however, the Plaintiffs have failed to identify *even a single* outstanding claim (*i.e.*, one of the 493 still-disputed claims) that *either* (1) was governed by a plan that didn't require a written appeal *or* (2) was properly appealed in accordance with the governing plan's requirements. And it's *this* evidentiary imbalance—not some abrogation by the Defendants of the Court's adjudicatory role—that entitles them to summary judgment. *See, e.g., McCay v. Drummond Co.*, 509 F. App'x 944, 946 (11th Cir. 2013) (affirming summary judgment of ERISA claims based on the claimant's failure to exhaust administrative remedies); *La Ley Recovery Sys.-OB, Inc. v. UnitedHealthcare Ins. Co.*, 2015 WL 12977396,

---

[26] Along similar lines, the Plaintiffs point out that the various plans required claimants to mail their appeals to different addresses. *See* Renewed MSJ Response at 5 (noting that the plans at issue "have different addresses for appeals"). So what? Whether you had to mail your paperwork to Address A or B or C, you still had to send your appeal *in writing*. And (again), with respect to the 493 disputed claims, the Plaintiffs have failed to point to a single document—wherever or however mailed—that even purports to constitute a written appeal.

at *9 (S.D. Fla. July 28, 2015), *aff'd*, 654 F. App'x 1017 (11th Cir. 2016) (granting summary judgment on exhaustion where the claimants "fail[ed] to raise a genuine issue of material fact contesting: (1) ERISA requires exhaustion of administrative remedies; (2) neither [claimant] attempted or completed any pre-suit exhaustion of administrative remedies, as required under the Plan; and (3) no exception to the exhaustion requirement applies"); *Jenkins v. Grant Thornton LLP*, 2015 WL 349275, at *10 (S.D. Fla. Jan. 23, 2015), *aff'd*, 667 F. App'x 754 (11th Cir. 2016) ("Defendants have shown that Plaintiff has failed to exhaust her administrative remedies under the Retirement Plan. A Plaintiff must exhaust available administrative remedies in ERISA actions before bringing suit in federal court. Here, Plaintiff has not provided evidence to show that she has submitted a claim or that she followed the procedures laid out in the Retirement Plan." (cleaned up)).

### D.  The Plaintiffs' Excuses

Lastly, the Plaintiffs advance five arguments for their request to be excused from the plans' exhaustion requirements, *see* Renewed MSJ Response at 7–8—all unpersuasive.

*First*, the Plaintiffs insist that exhaustion would have been futile. *Id.* at 8–10. In support of this argument, they say that, "by United's own admission, the 43 claims for which it had appeals were all denied." *Id.* at 9. In other words, the Plaintiffs ask: if these 43 claims were denied after procedurally proper appeals, why keep going with the remaining 493? Here, though, the Plaintiffs misrepresent the record. The Defendants *don't* concede that the 43 unchallenged claims were properly appealed; they merely acknowledge that there's at least some evidence for the proposition that they were. *See* Renewed MSJ at 8 ("United does not concede that any of the submissions as to these 43 App/Recon Claims satisfy the respective plan provisions for appeal[.]"). Since we don't know why those 43 claims were denied—or whether those denials were justified—those 43 appeals cannot (standing alone) establish futility.

Here's why. Assume for a moment that the Defendants denied those 43 claims because Dr. Ligotti didn't have a valid license. This isn't mere conjecture: As the Plaintiffs concede, many of their claims were denied for this very reason. *See* Third Amended Complaint ¶ 63 (alleging that the Defendants "refused to pay a bill submitted by Plaintiffs based upon the false assertion that Plaintiff LIGOTTI was not a licensed physician[.]"). Giving Dr. Ligotti the benefit of the doubt—*i.e.*, that he did have a valid license—his appeal may still have been properly denied for any number of valid reasons. So, for instance, he may have refused (or forgotten) to append a copy of his license to his appeal, or he may have failed to send in his paperwork within the 180-day window set out in most of the plans, or his appeal may have consisted of jumbled post-it notes decorated with illegible scribbles. The point is that the Defendants could have affirmed the denial on any of these grounds *without* making any statement at all about future appeals. That's because, if his appeals were denied for one or more of these reasons, Dr. Ligotti would then know that, to prevail on his next appeal, he had only to append a copy of his license or meet the 180-day window or submit his paperwork in legible writing. In these scenarios, then, the denied appeals would have had *no* bearing on the viability (or, as it were, futility) of any future appeals.

Now, is it *possible* that some number of these appeals were denied for invalid reasons? Sure. But, again, the Defendants haven't conceded that they were. And the Plaintiffs (who bear the burden of making a "clear and positive showing of futility," *Springer*, 908 F.2d at 901 (cleaned up)), have adduced no evidence that any of these 43 appeals was denied for an improper reason. They thus haven't given the Court any basis to believe that the denial of these 43 appeals rendered futile any effort to appeal the remaining 493.[27]

---

[27] There's a separate, more obvious problem with this argument—and it has to do with chronology. The Plaintiffs want us to believe that these 43 appeals influenced their future behavior—dissuaded them, in other words, from seeking review of any subsequent adverse determinations. Their position thus assumes that these 43 appeals *preceded* the 493 claims denials they didn't appeal. But they have no

The Plaintiffs also say that the Defendants "flagged" Dr. Ligotti's identification number—which, they insist, ensured that any future appeals would be pointless. *See* Renewed MSJ Response at 9. For this argument, the Plaintiffs cite the October 16, 2019 deposition of Christopher Hensley.[28] In doing so, however, the Plaintiffs mischaracterize Hensley as supporting their view that the flag "prohibited the payment *or appeals* of any claims" they submitted. *Id.* (emphasis added). But Mr. Hensley never said that the "flag" precluded the Plaintiffs' *appeals*. Instead, he testified only that the "flag" led to "a hard denial, so it stopped all of [the Plaintiffs'] *claims*[.]" *Id.*, Ex. G ("Oct. 16, 2019 Hensley Depo.") at 69:12–13 (emphasis added); *see also id.* at 72:7–10 ("Q. That flag would have resulted in any *claims* being submitted or any *claim* submitted by Dr. Ligotti to United being denied, correct? A. Correct." (emphases added)). Besides this mischaracterization of the record, the Plaintiffs adduce no evidence for their position that the "flag" prevented them from *appealing* the denied claims.

It's worth noting, too, that, long before this lawsuit was filed, the parties negotiated a resolution of the "hard flag" issue. As Mr. Hensley explained at a later deposition, the parties agreed to downgrade the "hard flag" to something called a "prepayment review flag." Feb. 13, 2020 Hensley Depo. [ECF No. 223-4] at 71:21–72:12 ("Q. . . . There was a prepayment review flag that you negotiated with Anelia Shaheed? A. There was. Q. That flag changed from a hard denial put in place by Optum Legal – A. Yes. Q. – to a prepayment review flag? A. Yes. Q. Optum Legal made the decision to put that prepayment review flag in place, correct? A. Optum Legal agreed with myself and Anelia and our agreement to remove the hard denial flag and place a prepayment review flag. Q. That prepayment review flag that was put in place pursuant to your agreement with Anelia, was that a plain

---

evidence of this. And, since these 43 appeals were likely distributed somewhat randomly along the timeline of 536 (total) denials, there's at least a subset (perhaps a substantial one) of the 493 un-appealed denials that couldn't have been influenced by the results of these 43 appeals because *they preceded* those appeals.

[28] Mr. Hensley was United's Rule 30(b)(6) corporate representative. *See* Subpoena Duces Tecum with Deposition Pursuant to Fed. R. Civ. P. 30(b) [ECF No. 155-1]; First MSJ Hr'g Tr. at 4:11–12.

prepayment review flag as you put it? A. Correct."). By all accounts, this downgraded flag was relatively innocuous. As Mr. Hensley testified, the "prepayment review flag" had little bearing on *even* the initial benefits determination and only required the flagged claimant (or medical provider) to support the initial claim with additional documentation. *See id.* at 56:16–22 ("Q. Who has authority to authorize payment of claims that are flagged for prepayment review. A. For the prepayment review, should the claims be supported through the medical record review, possibly member interview, and those claims be supported, then the reviewer themselves would have the authority to authorize payment of that specific claim that they review."). If the claimant did so, the claim would be approved—the flag notwithstanding. *Id.* Either way, the prepayment flag didn't preclude a successful *appeal*—and the Plaintiffs cite no evidence that it did.[29]

Without evidence that a flag (of either type) required the Defendants to deny the Plaintiffs' appeals, the flags don't help the Plaintiffs much. An insurer's initial denial of a claim, wrongful or not, doesn't excuse ERISA plaintiffs of their obligation to exhaust their administrative remedies. If a wrongful denial did excuse any future appeal, the futility exception would swallow the exhaustion rule. Claimants, after all, only ever appeal the initial denial when they think the initial determination was wrong. To excuse them from having to appeal in those circumstances would thus eliminate the exhaustion obligation precisely where it's *most* needed—*i.e.*, on the denials that are *most* likely to be appealed. We shouldn't blithely allow claimants to eviscerate a rule we view as important—a rule that

---

[29] *See* Feb. 13, 2020 Hensley Depo. at 57:7–24 ("Q. If a claim is flagged for prepayment review, and the prepayment—the person in charge of prepayment review denies the claim, may the Appeals Department authorize payment of the claim? . . . A. In my working knowledge of what—in my general knowledge of that process, should the prepayment review team deny a claim after they have for one of the multitude of reasons that they can deny a claim, no records received, the medical records themselves do not support the services, or any other multitude of reasons, and subsequently the provider goes through the process to have the claim either reconsidered and then subsequently appeal, should the provider provide the appropriate either documentation or what they need to provide to support the claim that they billed, then, yes, the Appeals Department would be able to pay the claim under the normal process if the provider is on a prepayment review.").

seeks to resolve disputes efficiently, without judicial intervention, by allowing insurers to correct their own mistakes *before* federal judges get involved. *See, e.g.*, *Bickley*, 461 F.3d at 1330 (explaining that the exhaustion requirement "reduces the number of frivolous lawsuits under ERISA, minimize[s] the cost of dispute resolution, enhances the plan's trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decisionmaking process, and allows prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated." (quoting *Mason v. Cont'l Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985))).[30]

---

[30]     Two remaining points on the "flag" issue. *First*, The Plaintiffs rely on *Demaria v. Horizon Healthcare Services, Inc.*, 2013 WL 3938973, at *7 (D.N.J. July 31, 2013), for the proposition that an insurer's automatic denial of a claim establishes futility, *see* Renewed MSJ Response at 8–9. But *Demaria* came before the court on a motion to dismiss. *See* 2013 WL 3938973, at *7 ("Plaintiffs have sufficiently pled that their resort to Horizon's internal appeals process would have been futile."). And we agree with *Demaria* that, to survive a motion to dismiss under 12(b)(6), an ERISA plaintiff need only *plead* (not prove) futility. At the summary judgment stage, by contrast—where we are now—an ERISA plaintiff must do more than simply rely on the allegations of his complaint. *See Springer*, 908 F.2d at 901 (describing the futility bar as high and requiring *the claimant* to make a "clear and positive showing of futility" (cleaned up)). To survive summary judgment, ERISA plaintiffs must substantiate those futility allegations with competent proof. *See, e.g.*, *La Ley Recovery*, 2015 WL 12977396, at *8 (granting insurer's motion for summary judgment where the claimant could demonstrate "only colloquial futility," but did not proffer any evidence of "the legal futility and denial of meaningful access required to excuse the exhaustion requirement necessary to bring an ERISA claim"). And, as we've shown, the Plaintiffs have offered no concrete evidence of futility. To the contrary, the record evidence shows *no barriers* to appeal and *no reason* to believe that future appeals would have been futile. In testimony that went entirely unrebutted, in fact, Mr. Hensley testified that, had the Plaintiffs included the proper documentation in their appeals, the appeals department would have had the authority to reverse the initial denial—the flags notwithstanding. *See* Feb. 13, 2020 Hensley Depo. at 57:7–24.

  *Second*, ignoring the unambiguous state of the law on this issue, the Plaintiffs suggest that *the Defendants* bear the burden of disproving futility. In the Plaintiffs' view, the Court should allow their futility charge to proceed unless the Defendants *admit* that, had the Plaintiffs appealed, United's reviewers would have reversed the flagged denials. *See* Renewed MSJ Response at 9 ("United has provided no evidence nor made the *key admission* that approved appeals for a flagged provider will be paid[.]"). As we've explained, however, the Plaintiffs have it exactly backwards. The Defendants have no obligation to speculate about the viability of appeals the Plaintiffs elected never to take. That's the entire point of the exhaustion requirement—to allow the insurer to decide whether the initial denial was proper, based on a complete record, *before* the case gets to federal court. In any event, the law here is pellucid: the burden is on the Plaintiffs, not the Defendants, to make a "clear and positive" showing that exhaustion would have been futile. *See Bickley*, 461 F.3d at 1330.

*Second*, the Plaintiffs insist that they were denied meaningful access to the Defendants' review procedures. *See* Renewed MSJ Response at 10–12. Here, however, they simply regurgitate the same "hard flag" arguments we've already rejected. By way of example, they note that, in *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir. 1990),[31] the Eleventh Circuit affirmed a district court's decision *not* to require an ERISA claimant to exhaust administrative remedies. But the claimant in *Curry* really was given the run-around by the plan administrator. So, for instance, the administrator first told the claimant that he'd have to wait *two years* to receive his plan benefits. *Id.* at 844. When the two years were up, though, the administrator—reenacting Laban's bait-and-switch[32]—denied the claim anyway. *Id.* When the claimant requested the plan documents that supported the denial, the administrator promised to provide them—but never did. *Id.* When the claimant insisted, the administrator referred him to the plan accountant, who, in a sinister Catch-22,[33] "refused to answer any questions because he had received no prior authorization from [the plan administrator]." *Id.*; *see also Kulik v. Metro. Life Ins. Co.*, 1998 WL 404383, at *3 (M.D. Fla. Feb. 25, 1998) ("A denial of meaningful access means that an appeals process exists, but that plan administrators have obstructed or obscured avenues to appeal; the plan administrator's actions reveal that the administrative appeal process exists only in theory, as a facade or a pretext for an appeals process.").

Our Plaintiffs have no similar evidence of evasion, obstruction, or obfuscation. To the contrary, the EOBs unambiguously directed them to the appeals procedures outlined in the governing plans, and those plans were themselves clear about the exhaustion requirements. *See* Nguyen Decl., Ex. 4 at 253 (plan provision setting forth the basic requirements of the written appeals process). And, indeed, Ms. Pressley admitted that the Defendants' representatives—who answered her calls—told

---

[31] *Abrogated on other grounds by Murphy v. Reliance Standard Life Ins. Co.*, 247 F.3d 1313 (11th Cir. 2001).
[32] *Genesis* 29:15–28.
[33] JOSEPH HELLER, CATCH-22 (1961).

her precisely how to appeal adverse claims determinations and where to look for additional guidance. *See* Pressley Decl. ¶ 15 ("I have been told and reviewed instructions on multiple occasions indicating that to submit an appeal, I had to follow the particular instructions provided by the health insurer[.]"). So, the problem isn't—as it was in *Curry*—that the Plaintiffs were denied meaningful access to the Defendants' review procedures. It's that they didn't follow the Defendants' procedures—or, at least, have produced no evidence (outside the 43 undisputed claims) that they did.

*Third*, the Plaintiffs suggest that enforcement of the Defendants' exhaustion requirement would irreparably harm them. *See* Renewed MSJ Response at 12–13. Here, again, they recycle the "flag" issue, *id.*—which we won't assess a third time—and claim that (1) the "Plaintiffs have made a sufficient showing that Defendants' administrative review procedure was fraught with misrepresentations, riddled with misdirection and unequal application and demonstrably inadequate for Plaintiffs['] claims that had been flagged," *id.* at 12, and that (2) there's "no legitimate mechanism by which they or Plaintiffs on their behalf can submit an appeal in accordance with the plan, simply put because SIU Optum Legal did not offer an appeals process for claims through its department nor could even reconcile the simple issue of verification of licensure to resolve claims." *Id.* at 13. Both statements are entirely unsubstantiated. The Plaintiffs cite not a single page of the record to establish either "misrepresentation," "misdirection," or "unequal application." And it's plainly not the Court's job to do this work for them. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

*Fourth*, the Plaintiffs characterize the Defendants' administrative remedies as inadequate. *See* Renewed MSJ Response at 13–14. Once again, though, the Plaintiffs do little more than reiterate their "flag" objections. *See id.* at 13. And, once again, they launch assertions that are wholly unsupported by the record, like this one: "United failed to honor the plan terms it now seeks to enforce by providing misleading information as to how appeals can be submitted." *Id.* at 14. Do they cite even a single line

of record evidence for this argument that the Defendants "failed to honor" plan terms? Of course not. *See id.* Summary judgment requires *evidence*, not aspirations.

*Fifth*, the Plaintiffs contend that the Defendants failed to comply with 29 C.F.R. § 2650.503-1—presumably, they mean 29 C.F.R. § 2560.503-1, which deals with ERISA claims procedures—and argue that this regulatory non-compliance excuses exhaustion. *See* Renewed MSJ Response at 2, 14. The (latter) regulation provides, in pertinent part, that (1) claims procedures may not "contain any provision, and [cannot be] administered in a way, that requires a claimant to file more than two appeals of an adverse benefit determination prior to bringing a civil action under section 502(a) of the Act," *id.* at (c)(2), and that (2) an adverse benefits determination—here, the EOBs—must include certain kinds of information, *id.* at (g)(1).

Starting with subsection (g)(1): The Plaintiffs never say that any of the EOBs *actually* excluded the classes of information (g)(1) requires. Nor, for that matter, do they attach, cite, or even quote from any EOBs. *See generally* Renewed MSJ Response. As for other potential violations of the regulation, there's not much to go on. The Plaintiffs insist that there are "plans that have more than 1 level of appeal, plans with different addresses, and plans that specifically state to call the customer service as the first step in an appeal. In fact, there are plans with a multitude of different processes that clearly demonstrate on the face of plan different requirements than enumerated in 29 CFR 2650.503-1 [sic] and contrary to United's position that all plans require the exact same appeals process." *Id.* at 15. But that's *mostly* the extent of their argument—legally and factually. We say *mostly* because here, again, the Plaintiffs point to their composite exhibits (A & B)—which include a handful of plans—without citing any pages or provisions from those plans or explaining how those plans substantiate their assertions. *Id.* So, for example, the Plaintiffs never describe any of these plans as implementing an illegal two-level appeals process—nor do they explain how any specific plan *might* be interpreted that way. That's probably because even a cursory glance at the plans undercuts any such claim. *See, e.g.*, Ex. A at 8

(noting that, "[i]f your appeal is denied, you have the right to file a lawsuit under ERISA"). The Plaintiffs also don't cite the plans that (they say) include "different addresses" or the provisions that (they claim) required them to call, rather than write, customer service. *See* Renewed MSJ Response at 15. Nor, by the way, do they ever deign to explain why those facts, if true, would have violated the federal regulations they've cited. They, after all, never get around to quoting (or even citing) *any* of the regulations' many subsections. *See id.*

The Plaintiffs, in sum, haven't made any showing—let alone a "clear and positive" showing—that any future appeals would have been futile. Nor have they established some other legitimate reason for us to excuse the exhaustion requirement.

***

After careful review, the Court hereby **ORDERS and ADJDUGES** as follows:

1. The First Clarification Motion [ECF No. 202] is **DENIED**.

2. The Second Clarification Motion [ECF No. 204] is **GRANTED in part and DENIED in part**, and the First MSJ Order [ECF No. 196] is hereby clarified in a manner consistent with this Order.

3. The Motion to Voluntarily Dismiss Dr. Ligotti [ECF No. 247] is **DENIED**.

4. The Defendants' Motion for Leave to File Surreply [ECF No. 250] is **DENIED as moot**.

5. The Renewed MSJ [ECF No. 224] is **GRANTED**. Only the 43 undisputed claims will proceed to trial.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 8th day of June 2021.

 

 

 

 

 

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record